## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL ACTION |
| Plaintiff, | |
| | Case No. 1:25-cv-1148-HYJ-PJG |
| v. | |
| JOCELYN BENSON, in her official capacity as Michigan Secretary of State; and the STATE OF MICHIGAN, | Hon. Hala Y. Jarbou |
| Defendants. | ORAL ARGUMENT REQUESTED |

### PROPOSED MOTION TO DISMISS OF PROPOSED DEFENDANT-INTERVENORS MICHIGAN ALLIANCE FOR RETIRED AMERICANS, DONALD DUQUETTE, AND KEELY CRIMANDO

Proposed Intervenor-Defendants Michigan Alliance for Retired Americans, Donald Duquette, and Keely Crimando (collectively, "Proposed Intervenors") move to dismiss Plaintiff's Complaint because it fails to state a claim for which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).[1]

Concurrence with this motion will be determined upon the Court's resolution of the motion to intervene, but Proposed Defendant-Intervenors presume concurrence will be declined.

WHEREFORE, Proposed Intervenors request that the Court dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

---

[1] Proposed Intervenors request that the Court accept this Proposed Motion to Dismiss in the event that the Court grants their Motion to Intervene, ECF No. 5. *See Donald Trump for President, Inc. v. Benson*, No. 1:20-cv-01083-JTN-PJG, 2020 WL 8573863, at *3 (W.D. Mich. Nov. 17, 2020) (granting proposed intervenors' motions to intervene and simultaneously accepting for consideration proposed intervenors' proposed motions to dismiss); *Am. Tradition Inst. v. Colorado*, No. 11-cv--00859-WJM-BNB, 2012 WL 555513, at *3 (D. Colo. Feb. 21, 2012) (similar).

November 12, 2025

Respectfully submitted,

*/s/ Sarah S. Prescott*
Sarah Prescott
**SALVATORE PRESCOTT PORTER & PORTER**
105 E. Main St.
Northville, MI 48167
Telephone: 248-679-8711
prescott@spplawyers.com

Aria C. Branch
Josh Abbuhl
Branden D. Lewiston
Derek A. Zeigler
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Telephone: (202) 968-4490
abranch@elias.law
jabbuhl@elias.law
blewiston@elias.law
dzeigler@elias.law

*Counsel for Proposed Intervenors the Michigan Alliance for Retired Americans, Donald Duquette, and Keely Crimando*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL ACTION |
| Plaintiff, | |
| v. | Case No. 1:25-cv-1148-HYJ-PJG |
| JOCELYN BENSON, in her official capacity as Michigan Secretary of State; and the STATE OF MICHIGAN, | Hon. Hala Y. Jarbou |
| Defendants. | ORAL ARGUMENT REQUESTED |

**PROPOSED DEFENDANT-INTERVENORS MICHIGAN ALLIANCE FOR RETIRED AMERICANS, DONALD DUQUETTE, AND KEELY CRIMANDO'S MEMORANDUM IN SUPPORT OF PROPOSED MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

I.     Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional separation of powers.......................................................... 2

II.    DOJ embarks on a nationwide campaign to collect voter data held by states. ................... 4

III.   DOJ sues Michigan as part of its effort to create a national voter list. .............................. 7

LEGAL STANDARD.......................................................................................................... 8

ARGUMENT ...................................................................................................................... 9

I.     DOJ has not stated any claim entitling it to Michigan's statewide voter registration list........................................................................................................................................ 9

    A.    The NVRA does not entitle DOJ to Michigan's full unredacted voter list............ 9

    B.    HAVA does not entitle DOJ to Michigan's full unredacted voter registration list........................................................................................................................... 12

    C.    The Civil Rights Act of 1960 does not entitle DOJ to Michigan's voter registration list. ...................................................................................................... 13

        1.    Title III was designed to combat the denial of voting rights based on race.............................................................................................................. 14

        2.    By its plain text, Title III does not cover Michigan's internally-created statewide voter registration list. .............................................................. 15

        3.    DOJ lacks a proper basis and purpose to demand records under Title III.................................................................................................... 19

        4.    Title III does not prohibit redacting sensitive voter information.............. 21

II.    DOJ has not stated any other claim for relief. ................................................................. 22

CONCLUSION.................................................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*In re Admin. Subpoena No. 25-1431-019*,
No. 1:25-MC-91324-MJJ, 2025 WL 2607784 (D. Mass. Sept. 9, 2025) ............................ 21

*Ala. ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960) ..................................................................................... 14

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .................................................................................................................... 3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................................. 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................................................. 24

*CFPB v. Accrediting Council for Indep. Colls. & Schs.*,
854 F.3d 683 (D.C. Cir. 2017) ............................................................................................. 20

*CFPB v. Source for Pub. Data, L.P.*,
903 F.3d 456 (5th Cir. 2018) ................................................................................................ 19

*Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*,
508 F.3d 327 (6th Cir. 2007) .................................................................................................. 4

*Courser v. Allard*,
969 F.3d 604 (6th Cir. 2020) .................................................................................................. 8

*In re Crigler*,
No. 2:24-cv-12324, 2025 WL 2630737 (E.D. Mich. Sept. 12, 2025) .............................. 8, 9

*Darby v. Kagler*,
No. 5:16-cv-2426, 2017 WL 2869377 (N.D. Ohio July 5, 2017) ........................................ 24

*Donovan v. FirstCredit, Inc.*,
983 F.3d 246 (6th Cir. 2020) ................................................................................................ 15

*Fischer v. United States*,
603 U.S. 480 (2024) .............................................................................................................. 17

*Foster v. Love*,
522 U.S. 67 (1997) .................................................................................................................. 3

*Harkless v. Brunner*,
    545 F.3d 445 (6th Cir. 2008) .................................................................... 23

*Honeycutt v. United States*,
    581 U.S. 443 (2017) ............................................................................... 17

*Huddleston v. United States*,
    415 U.S. 814 (1974) ............................................................................... 17

*Husted v. A. Philip Randolph Inst.*,
    584 U.S. 756 (2018) ................................................................................. 3

*Johnson v. Washington*,
    No. 2:22-cv-12360, 2023 WL 9510833 (E.D. Mich. Dec. 18, 2023) ........................... 13, 23

*Kennedy v. Lynd*,
    306 F.2d 222 (5th Cir. 1962) ................................................................. 20, 21

*Loughrin v. United States*,
    573 U.S. 351 (2014) ............................................................................... 16

*McCloskey v. Mueller*,
    446 F.3d 262 (1st Cir. 2006) ................................................................. 13, 23

*Perez v. Postal Police Officers Ass'n*,
    736 F.3d 736 (6th Cir. 2013) ..................................................................... 17

*Popa v. Harriet Carter Gifts, Inc.*,
    52 F.4th 121 (3d Cir. 2022) ...................................................................... 17

*Prewett v. Weems*,
    749 F.3d 454 (6th Cir. 2014) ..................................................................... 17

*Project Vote, Inc. v. Kemp*,
    208 F. Supp. 3d 1320 (N.D. Ga. 2016) ............................................................. 11

*Project Vote/Voting for Am., Inc. v. Long*,
    682 F.3d 331 (4th Cir. 2012) ..................................................................... 11

*Project Vote/Voting For Am., Inc. v. Long*,
    752 F. Supp. 2d 697 (E.D. Va. 2010) .............................................................. 11

*Pub. Int. Legal Found. v. Benson*,
    136 F.4th 613 (6th Cir. 2025) ............................................................. 19, 22, 23

*Pub. Int. Legal Found., Inc. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024) ................................................................. 1, 10, 21

*Pub. Int. Legal Found., Inc. v. Matthews*,
    589 F. Supp. 3d 932 (C.D. Ill. 2022) .................................................... 11

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
    996 F.3d 257 (4th Cir. 2021) ................................................................ 11

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
    120 F.4th 390 (4th Cir. 2024) ............................................................... 3, 7

*True the Vote v. Hosemann*,
    43 F. Supp. 3d 693 (S.D. Miss. 2014) .................................................. 11

*Union Pac. R.R. Co. v. United States*,
    865 F.3d 1045 (8th Cir. 2017) .............................................................. 16

## US CONSTITUTIONAL PROVISIONS

U.S. Const. art. I § 4, cl. 1 ............................................................................ 2, 3

## FEDERAL STATUTES

5 U.S.C. § 552a ............................................................................................ 21

6 U.S.C. § 1502 ............................................................................................ 16

7 U.S.C. § 12 ................................................................................................ 16

13 U.S.C. § 214 ............................................................................................ 16

18 U.S.C. § 1703 .......................................................................................... 16

18 U.S.C. § 1709 .......................................................................................... 16

18 U.S.C. § 1968 .......................................................................................... 16

18 U.S.C. § 2721 .......................................................................................... 21

18 U.S.C. § 3500 .......................................................................................... 16

30 U.S.C. § 1732 .......................................................................................... 16

49 U.S.C. § 47124a ...................................................................................... 16

50 U.S.C. § 217 ................................................................................................ 16

52 U.S.C. § 20501 ............................................................................................. 3

52 U.S.C. § 20507 ........................................................... 3, 9, 12, 20, 22

52 U.S.C. § 20510 ........................................................................................... 23

52 U.S.C. § 20701 ..................................................... 1, 14, 15, 16, 18

52 U.S.C. § 20702 ........................................................................................... 15

52 U.S.C. § 20703 ............................................................... 15, 16, 19

52 U.S.C. § 21083 ................................................................. 13, 18, 22

52 U.S.C. § 21085 ...................................................................... 3, 20

52 U.S.C. § 21111 ........................................................................................... 12

**STATE STATUTES**

21-A M.R.S. § 196-A ....................................................................................... 10

Mich. Comp. Laws § 168.509gg ..................................................... 1, 10, 21

**OTHER AUTHORITIES**

11 C.F.R. § 9428.7 ...................................................................................... 5, 22

Br. for the United States as Amicus Curiae, *Pub. Int.*
   *Legal Found. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) (No. 23-1361), 2023 WL 4882397. 10, 11

Br. for the United States as Amicus Curiae in Support of Plaintiff-Appelle, *Project Vote/Voting for Am. v. Long*, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809), 2011 WL 4947283 ....................................................................................... 11

*Come into possession, Cambridge Dictionary,* https://dictionary.cambridge.org/us/thesaurus /come-into-possession-of (last visited Nov. 12, 2025) ........................................ 15

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/8VP4-WRXD ........................... 4

Fed. R. Civ. P. 12 ........................................................................................... 8

H.R. Rep. No. 86-956 (1959) ............................................................................ 14

H.R. Rep. No. 107-329 (2001) .................................................................... 2, 13

*Receive*, *Black's Law Dictionary* (12th ed. 2024) ...................................... 135

Jonathan Shorman, *Some Republican States Resist DOJ Demand for Private Voter Data*,
   Stateline (Sept. 18, 2025), https://stateline.org/2025/09/18/some-republican-states-resist-
   doj-demand-for-private-voter-data/ ............................................................. 4

Karen L. Shanton, Cong. Rsch. Serv., IF13056, *The Election Administration and Voting
   Survey (EAVS): Overview and 2024 Findings* (2025) ............................. 5

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department
   Requests for Voter Information*, Brennan Ctr. for Just. (Oct. 28, 2025),
   https://perma.cc/CZ8S-JRRK ....................................................................... 4

## INTRODUCTION

The United States Department of Justice ("DOJ") seeks to build a nationwide voter registration list, a scheme not authorized by Congress and contrary to federal laws assigning states the responsibility for maintaining voter registration. To build this unauthorized and unprecedented federal list, DOJ has demanded that dozens of states turn over their full, unredacted voter lists, even though state laws often shield voter information on those lists—most notably driver's license numbers, partial social security numbers, and dates of birth—from disclosure. Michigan law is no exception: it dictates that Michigan election officials "shall not release" sensitive voter information, including driver's license numbers, dates of birth, and partial social security numbers. Mich. Comp. Laws § 168.509gg(1)-(2).

Because Michigan—like nearly every other state contacted by DOJ—has so far refused to comply with its demands, DOJ has amplified its pressure campaign by filing suit to forcibly obtain the state's voter registration list. Far from granting such relief, this Court should dismiss this action under Rule 12(b)(6) because DOJ has failed to state a claim. DOJ cites three authorities in support of its demand—the National Voter Registration Act ("NVRA"), the Help America Vote Act ("HAVA"), and Title III of the Civil Rights Act of 1960—but none provide DOJ with authority to require the production of Michigan's unredacted voter registration list. Courts have broadly (and recently) recognized that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in . . . [v]oter [f]ile[s]." *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ("*PILF*"). HAVA does not contain *any* disclosure provision. And the text of Title III of the Civil Rights Act plainly does not apply here: that long-dormant statute extends only to "records and papers *which come into [election officials'] possession*." 52 U.S.C. § 20701 (emphasis added). State voter registration lists are internal

documents *created* by election officials; thus, unlike an application for voter registration or a similar document submitted by voters to state election officials, a state-created computer file never "come[s] into" an election official's "possession." Title III therefore does not reach Michigan's internally generated statewide voter registration list. Even if it did, DOJ's demand here is improper because it is not supported by an adequate basis or purpose, and, as with the NVRA, nothing in the text of Title III prevents states from redacting the sensitive voter information DOJ seeks.

Tellingly, DOJ's Complaint nowhere identifies past instances where any of the statutes upon which it purports to rely on have been used to obtain the sort of sensitive voter information that DOJ now demands. The reasons why are clear: not only has such an effort never been tried before, it runs contrary to the decentralized structure of our federal electoral system. That system is decentralized and state-focused *by design*. *See, e.g.*, U.S. Const. art. I, § 4, cl. 1 (giving the States principal authority over congressional elections). When enacting HAVA after the contested 2000 election, Congress stressed that the "dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome." H.R. Rep. No. 107-329, at 32 (2001). DOJ's lawsuit therefore asserts sweeping federal authority over the management of federal elections that is not only unprecedented, it is unsupported by the statutes that DOJ cites and entirely antithetical to the carefully designed system of American elections as reflected by the Constitution, federal law, and the states' rightful administration of their own elections. The Court should dismiss the Complaint with prejudice under Rule 12(b)(6) for failure to state a claim.

## BACKGROUND

I.    **Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional separation of powers.**

The U.S. Constitution "invests the States with responsibility for the mechanics" of

elections, subject to any decision by Congress to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also* U.S. Const. art. I, § 4, cl. 1. Accordingly, as a default matter, the Constitution assigns states the responsibility for determining voter eligibility and maintaining lists of eligible voters. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013).

While Congress has enacted certain laws governing voter registration, these laws augment existing "state voter-registration systems," *id.* at 5, and confirm that states are the custodians of voter registration data. Congress in 1993 enacted the NVRA to serve "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see also* 52 U.S.C. § 20501(b). Tellingly, that law charges *states*—not the federal government—with the "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including maintaining voter lists (subject to strict procedural safeguards), *id.* § 20507(c)-(g). It similarly makes *states* the custodians of voter lists. *See Husted*, 584 U.S. at 761.

In the wake of the 2000 elections, Congress enacted HAVA "to improve voting systems and voter access." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Like the NVRA, HAVA regulates how *states* maintain voter registration lists, requiring that they create a "computerized statewide voter registration list" and "perform list maintenance." 52 U.S.C. § 21085. HAVA is abundantly clear that this list is "defined, maintained, and administered at the State level." *Id.* § 21803(a)(1)(A). And more generally, HAVA commands that the "specific choices on the methods of complying with" HAVA "shall be left to the discretion of the State." *Id.* § 21085. Indeed, HAVA's legislative history stressed the importance of maintaining our decentralized electoral system to preserving liberty:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. The dispersal of

> responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, at 31-32 (2001). And while HAVA requires states to create their own centralized statewide voter registration lists, nothing in the law obligates them to disclose records in any manner, including to the federal government.

## II.    DOJ embarks on a nationwide campaign to collect voter data held by states.

This spring, DOJ launched an unprecedented campaign to demand broad access to state voter files, which include sensitive and personal information about each registered voter. To date, DOJ has sent demands to at least forty states, with plans to make similar demands on all fifty.[1] It seeks to use the data to create a national voter database that will, in turn, be used to attempt to substantiate President Trump's unfounded accusations that millions of noncitizens have voted illegally in recent elections.[2] The vast majority of states that have received such demands—including those led by Republican officeholders—have refused to comply, declining to turn over sensitive information that is typically protected by state law.[3]

DOJ sent its demand letter to Michigan on July 21, 2025, seeking Michigan's computerized statewide voter registration list. ECF No. 1 at PageID.10-11, ¶35; Ex. A at 1 ("July 21 Letter").[4]

---

[1] *See* Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/8VP4-WRXD; Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Oct. 28, 2025), https://perma.cc/CZ8S-JRRK.

[2] Barrett & Corasaniti, *supra* note 1.

[3] Jonathan Shorman, *Some Republican States Resist DOJ Demand for Private Voter Data*, Stateline (Sept. 18, 2025), https://stateline.org/2025/09/18/some-republican-states-resist-doj-dem and-for-private-voter-data/ (reporting only Indiana has so far given DOJ everything it sought).

[4] The other letters include an August 14, 2025, Letter sent from DOJ to Secretary Benson and two response letters sent from Secretary Benson to DOJ, one on September 2, 2025, Ex. B ("September

DOJ also asked Secretary Benson about Michigan's list maintenance efforts and posed several questions about Michigan's responses to Election Administration and Voting Survey ("EAVS") prompts, including about Michigan's efforts to (i) remove ineligible voters, (ii) remove duplicate registrations, (iii) send confirmation notices to possibly inactive voters, (iv) remove voters who failed to vote in two elections after receiving confirmation notices, (v) remove voters who moved away from Michigan, and (vi) remove deceased voters. Ex. A at 2-3.[5]

In an August 4, 2025, email response to DOJ's initial request, Secretary Benson sought a reasonable extension of time to assess and "comply with the request," which DOJ flatly rejected by email on August 8, 2025. ECF No. 1 at PageID.12, ¶41. Instead, DOJ "demanded" that Secretary Benson produce the information by August 18, 2025, or, for "items that may take more time," by September 8, 2025. *Id.* For the rest of August, Secretary Benson's office attempted to provide DOJ with the information that it believed it could legally provide in response to DOJ's demand. *See* Ex. C at 2 ("Over the past three weeks, our office has worked in good faith to provide [a limited] statewide voter registration list, but the DOJ's system has not permitted the upload.").

---

2 Letter"), and the other on September 9, 2025, Ex. C ("September 9 Letter"). Though not submitted with DOJ's Complaint, the Court may properly consider these letters at the motion-to-dismiss stage because "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335-36 (6th Cir. 2007). DOJ repeatedly refers to and quotes from these letters throughout the Complaint, making them integral to DOJ's claims. ECF No. 1 PageID.10-12, 16-17, ¶¶ 35, 38-40, 55, 59, 64 (July 21 Letter); *id.* at PageID.13, ¶ 45 (September 2 Letter); *id.* at PageID.13-14, 16-18 ¶¶ 46, 48-49, 56, 60, 65-66 (September 9 Letter).

[5] EAVS is a biennial survey of state and local election officials administered by the U.S. Election Assistance Commission ("EAC"). *See* 11 C.F.R. § 9428.7. EAVS asks state and local election officials to answer questions concerning the administration of federal elections, including those involving the voter registration process, military and overseas voting, mail voting, in-person polling operations, provisional voting, and election-related technologies. *Id.* at § 9428.7(b)(6)(i)-(vii). Subsequently, EAC reports its findings to Congress and the public after each regular federal election cycle. *See* Karen L. Shanton, Cong. Rsch. Serv., IF13056, *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings* (2025).

DOJ sent a second letter on August 14, 2025, to Secretary Benson, again demanding that her office produce this sensitive voter information and arguing that federal law, including the Privacy Act, 5 U.S.C. § 552a, and the Driver's Privacy Protection Act, 18 U.S.C. § 2721 *et seq*., did not prevent her office from disclosing sensitive voter information in its possession. ECF No. 1 at PageID.13, ¶¶42-44; Ex. B at 1-2 (refencing August 14 Letter).

On September 2, 2025, Secretary Benson sent a letter to DOJ, indicating that she would provide DOJ with Michigan's "Qualified Voter File," which contains much of the information that DOJ sought, but that she would not disclose sensitive voter information exempt from disclosure under state and federal law. Ex. B at 1-2; *see* ECF No. 1 at PageID.13, ¶45. As part of that response and objection to DOJ's demand, Secretary Benson noted the reasons that DOJ sought the information, including to "ensure Michigan's compliance with the NVRA and the HAVA," but cited federal judicial decisions that hold "confidential personally identifiable information is exempt from disclosure." Ex. B at 2 (collecting cases).

Secretary Benson sent DOJ a second letter on September 9, 2025, which reiterated her objection to DOJ's demand for voters' confidential information and her refusal to disclose that information. Ex. C at 1-2; *see* ECF No. 1 at PageID.13-14, ¶¶46, 48-49. In this letter, Secretary Benson also thoroughly answered DOJ's questions, including those regarding Michigan's response to the EAVS survey, and provided a comprehensive overview of Michigan's process for identifying and removing ineligible voters from the state's voting rolls. Ex. C at 2-6. The letter explains that, since 2019, Michigan has "cancelled more than 1.4 million registrations under state and federal law, including the NVRA," and that more than 250,000 additional registrations are "slated for cancellation in 2027 and 2029." *Id.* at 3. The letter further directed DOJ to a recent Sixth Circuit decision that held that Michigan's approach was an "inherently rational, sensible

attempt at maintaining accurate voter registration lists." *Id.* (quoting *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 628 (6th Cir. 2025)). It also responded to DOJ's assertion that it received a complaint from an individual who claimed that Michigan was non-compliant with HAVA's unique voter identification requirement by informing DOJ of Michigan's process to comply with HAVA and requesting that DOJ forward the complaint to the Michigan Bureau of Elections—the office tasked with addressing such complaints in Michigan. *Id.* at 5.

It appears that Secretary Benson never received a response to the concerns or objections raised in her September 2 or 9 Letters. Instead, DOJ filed this suit on September 25, 2025. ECF No. 1.

### III.    DOJ sues Michigan as part of its effort to create a national voter list.

DOJ filed this suit on September 25, 2025, primarily seeking to compel Michigan to produce its full, unredacted statewide voter registration list. ECF No. 1 at PageID.19, Prayer for Relief, ¶D.

DOJ claims that it is entitled to relief under the NVRA, HAVA, and the Civil Rights Act of 1960. But the specific relief it seeks under each of these claims is muddled. The only reasonably clear demand comes from DOJ's allegation that Michigan must produce its statewide voter registration list. *See id.* at PageID.16-18, ¶¶56-57, 60-61, 66. DOJ also vaguely alleges that Michigan failed to provide "sufficient responses" to DOJ's "specific inquiries regarding [Michigan's] maintenance procedures"—seemingly referencing its written questions to Secretary Benson, not its request for Michigan's statewide voter registration list, *id.* at PageID.17, ¶60; *cf. id.* ¶¶64-65, but the Complaint does not request relief on that issue, *id.* at PageID.18-19, Prayer for Relief.

The same day that DOJ sued Michigan, it filed nearly identical lawsuits against California, New York, Minnesota, New Hampshire, and Pennsylvania. *See* Complaint, *United States v. Weber*,

No. 2:25-cv-9149 (C.D. Cal. Sept. 25, 2025); Complaint, *United States v. Bd. of Elections of the State of N.Y.*, No. 1:25-cv-1338 (N.D.N.Y Sept. 25, 2025); Complaint, *United States v. Simon*, No. 0:25-cv-3761 (D. Minn. Sept. 25, 2025); Complaint, *United States v. Scanlan*, No. 1:25-cv-371 (D.N.H. Sept. 25, 2025); Complaint, *United States v. Pennsylvania.*, No. 2:25-cv-1481 (W.D. Pa. Sept. 25, 2025). Days earlier, DOJ had sued the states of Oregon and Maine asserting similar claims under the NVRA, HAVA, and the Civil Rights Act. *See* Complaint, *United States v. Oregon*, No. 6:25-cv-1666 (D. Or. Sept. 16, 2025); Complaint, *United States v. Bellows*, No. 1:25-cv-468 (D. Me. Sept. 16, 2025).

Proposed Intervenors comprise a Michigan-based civic organization that represents over 200,000 members throughout the state, as well as two individual Michigan voters. They moved to intervene as defendants to assert and protect their privacy interests on September 30, 2025, just five days after DOJ filed its complaint. *See* ECF No. 5 at PageID.27-28. That motion remains pending.

## LEGAL STANDARD

A complaint must be dismissed where it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At the motion-to-dismiss stage, the Court "must take factual allegations as true, but need not accept legal conclusions couched as factual allegations." *Courser v. Allard*, 969 F.3d 604, 615 (6th Cir. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Iqbal*, 556 U.S. at 678 (explaining courts need not accept "legal conclusions" as true at the motion to dismiss stage). A complaint fails to state a claim "if its allegations do not support recovery under any recognizable legal theory." *In re Crigler*, No. 2:24-cv-12324, 2025 WL 2630737, at *2 (E.D. Mich. Sept. 12, 2025) (citing *Iqbal*, 556 U.S. at 678).

## ARGUMENT

### I.    DOJ has not stated any claim entitling it to Michigan's statewide voter registration list.

The Complaint squarely seeks only one form of relief: the compelled disclosure of Michigan's entire, unredacted statewide voter list. ECF No. 1 at PageID.19, Prayer for Relief, ¶D. Such relief, if granted, would be unprecedented. DOJ cites three statutes to justify this demand: (1) the NVRA; (2) HAVA; and (3) the Civil Rights Act of 1960. ECF No. 1 at PageID.16-18, ¶¶54-66. But none of these laws supply "any recognizable legal theory" for DOJ's demand for Michigan's statewide voter list. *In re Crigler*, 2025 WL 2630737, at *2. DOJ's vague allegations—unsupported by any request for relief—that Secretary Benson failed to provide "sufficient responses" to DOJ's "specific inquiries" fare no better. *See* ECF No. 1 at PageID.17, ¶60. In addition to relying upon the same flawed readings of the NVRA, HAVA, and the Civil Rights Act, these allegations are wholly vague and conclusory and thus fail to plausibly state a claim.

### A.    The NVRA does not entitle DOJ to Michigan's full unredacted voter list.

DOJ points to the NVRA to support its demand for Michigan's unredacted voter list, *id.* at PageID.16-17, ¶¶58-61, but that law cannot sustain the weight DOJ puts on it. What the NVRA requires is that each state "maintain for at least 2 years and . . . make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). This "public inspection" requirement is the sole disclosure provision in the NVRA, and, by its terms, it does not grant the federal government special inspection rights beyond those available to the public. Moreover, courts across the country have squarely rejected the notion that the public inspection provision obligates states to provide *every* piece of information contained in covered records—up to and including highly sensitive personal information contained within those files.

Instead, courts have recognized that nothing in the NVRA's text prohibits states from redacting sensitive voter information before disclosure and that doing so does not violate that federal law.

As a recent example, in *PILF*, the First Circuit heard a challenge to a Maine law that made a limited version of the state's voter registration list available for purchase but also restricted the use and publication of that list by purchasers. 92 F.4th at 43-44 (citing 21-A M.R.S. § 196-A(1)(J)(1)-(2)). The court held that while the voter registration list was a "record" covered by § 20507(i) and therefore subject to public inspection, *see id.* at 45-49, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in" such voter files. *Id.* at 56; *see also id.* (citing with approval decisions recognizing that states could redact information such as birthdates and Social Security numbers). Accordingly, the First Circuit recognized that the "proper redaction of certain personal information" in statewide voter registration lists could "assuage the potential privacy risks implicated by the public release of the [v]oter [list]." *Id.* In so holding, the First Circuit effectively recognized that the NVRA's public inspection provisions did not preempt or circumvent the Maine legislature's lawfully enacted privacy requirements, which largely parallel Michigan's state law protections for sensitive voter information and prohibit disclosure of the highly sensitive personal information that DOJ seeks. *See* 21-A M.R.S. § 196-A(1); Mich. Comp. Laws § 168.509gg(1)-(2).

That conclusion should come as no surprise to DOJ—it filed an amicus brief in *PILF* urging the First Circuit to reach that result. *See* Br. for the United States as Amicus Curiae in Support of Plaintiff-Appellee at 27-30, *PILF*, 92 F.4th 36 (No. 23-1361), 2023 WL 4882397, at *27-30. While the DOJ opposed Maine's argument that it could place broad limitations on a requester's ability to use and publish the voter registration list, DOJ recognized that the state's "privacy concerns" were "substantial." *Id.* at *27. To that end, its brief "emphasize[d] the limits on [§ 20507(i)'s]

preemptive scope." *Id.* Most notably, it conceded that "*the NVRA does not prohibit States from redacting 'uniquely sensitive information' like voters' Social Security Numbers before disclosing records.*" *Id.* (emphasis added) (citing *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012)). And it further conceded that the NVRA does not "prohibit [states from] redacting an even broader set of personal information in certain sensitive circumstances." *Id.* (citing *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021)). DOJ made similar arguments more than a decade earlier. *See* Br. for the United States as Amicus Curiae at 11, 25-26, *Project Vote/Voting for Am.*, 682 F.3d 331 (No. 11-1809), 2011 WL 4947283, at *11, 25-26. Its current demand that Michigan produce an entirely unredacted voter registration file reflects an unexplained reversal of its longstanding (and correct) view of federal law.

The First Circuit's holding in *PILF* is no outlier—several other courts have reached the same conclusion. *See Project Vote*, 682 F.3d at 339 (affirming district court order to redact social security numbers before disclosure under NVRA); *N.C. State Bd. of Elections*, 996 F.3d at 268 (recognizing that the NVRA permits redactions to "protect sensitive information"); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022) (holding the NVRA permits "proper redaction of highly sensitive information"); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) (holding the NVRA "does not require the disclosure of sensitive information that implicates special privacy concerns," including telephone numbers, partial social security numbers, partial email addresses, and birth dates); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014) (holding the NVRA "does not require the disclosure of unredacted voter registration documents, including voter registrant birthdates"); *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010) (holding the NVRA permits redacting

11

social security numbers). Although the Sixth Circuit has yet to address the question, this broad and uniform precedent from multiple courts across the country reaffirms that the NVRA does not grant the invasive authority that DOJ claims here. This Court should follow suit.

To hold otherwise would have striking privacy implications. As noted, the NVRA's public inspection provision provides no special disclosure rights to the federal government. 52 U.S.C. § 20507. Thus, any right that DOJ may have to request inspection of records under § 20507(i) is a right that is equally shared by the general public. Consequently, if it were the case (as DOJ incorrectly presses) that it has the right under § 20507(i) to demand the complete, unredacted voter registration list, then any member of the public can do the same. Not only would that conclusion be contrary to the many decisions holding precisely the opposite, it also would work a radical and unexpected harm to voter privacy, allowing any person to demand the driver's license numbers, dates of birth, and partial social security numbers of every registered voter, in every state. There is no reason for the Court to depart from the judicial consensus about the scope of the NVRA and jeopardize the privacy rights of hundreds of millions of registered voters.

**B.      HAVA does not entitle DOJ to Michigan's full unredacted voter registration list.**

DOJ points to HAVA as another basis for relief, but that statute also does not support its demand. In fact, HAVA contains no disclosure requirements *at all*. DOJ's Complaint and correspondence cite no authority to the contrary, relying instead upon a provision permitting the Attorney General to file suit "as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements" of HAVA. 52 U.S.C. § 21111. But the underlying statutory provisions DOJ may enforce through § 21111 say nothing about permitting DOJ to demand state voter registration lists at will. To the contrary, the sole underlying provision concerning voter registration affirms that voter registration lists must be "maintained" and

12

"administered at the State level"—not by the federal government. *Id.* § 21083(a)(1)(A); *see also* H.R. Rep. No. 107-329, at 32, 36 (2001) (emphasizing that "local control must be preserved" under HAVA and voter registration databases should be "administered at the state level"). Nothing in HAVA provides any basis for DOJ to compel the disclosure of information that the Constitution and federal law both instruct to be administered at the state level.

Further, it would defy logic to conclude that HAVA implicitly authorizes, let alone *requires*, states to disclose all voter information, including sensitive and personal information protected by state law. Since the NVRA—which has an actual public disclosure provision— permits states to redact sensitive and personal voter information, HAVA—which does not contain *any* disclosure requirement—cannot somehow be read to have broader preemptive effect on state privacy laws than the NVRA. And the mere fact that HAVA grants the Attorney General a cause of action to enforce HAVA's substantive requirements changes nothing because those substantive requirements impose no obligation on states to disclose records to the federal government.

Meanwhile, DOJ makes no allegation whatsoever that Michigan has violated HAVA's substantive requirements. The federal government, as much as any litigant, is not permitted to "conduct fishing expeditions in hopes of discovering claims that they do not know they have." *McCloskey v. Mueller*, 446 F.3d 262, 271 (1st Cir. 2006); *see Johnson v. Washington*, No. 2:22-cv-12360, 2023 WL 9510833, at *5 (E.D. Mich. Dec. 18, 2023) ("[A] federal lawsuit is not a deep sea fishing expedition in which a plaintiff gets to troll the waters, hoping to snag a fish in [its] net." (citing *Aaron v. Medtronic, Inc.*, 209 F. Supp. 3d 994, 1001 (S.D. Ohio 2016)).

### C.    The Civil Rights Act of 1960 does not entitle DOJ to Michigan's voter registration list.

In its final effort to justify its disclosure demand, DOJ dusts off Title III of the Civil Rights Act of 1960, a long dormant law passed in the civil rights era to combat racial discrimination in

voting in Jim Crow states. *See* 52 U.S.C. § 20701, *et seq*. As with the NVRA and HAVA, Title III does not support DOJ's demands.

### 1.    Title III was designed to combat the denial of voting rights based on race.

Congress enacted Title III to buttress protections against racial discrimination in voting contained in the Civil Rights Act of 1957. *See* H.R. Rep. No. 86-956, at 3 (1959) (finding that while "some progress" has been made since the Civil Rights Act of 1957 toward the "elimination of discrimination because of race," there was a "need for additional legislation to implement the enforcement of civil rights"); *Ala. ex rel. Gallion v. Rogers,* 187 F. Supp. 848, 853 (M.D. Ala. 1960) ("The legislative history leaves no doubt but that [Title III] is designed to secure a more effective protection of the right to vote."), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). In the Civil Rights Act of 1957, Congress tasked DOJ with protecting the "right of all qualified citizens to vote without discrimination on account of race." H.R. Rep. No. 86-956, at 7 (1959). Despite this charge, DOJ's efforts were stymied by "the refusal of some state and local authority to permit" inspection of voter registration records. *Id.* DOJ had "no existing power in civil proceedings to require the production of [voter registration] records during any investigation" concerning "complaints of a denial to vote because of race." *Id.* Congress found that without granting DOJ a "suitable provision for access to voting records during the course of an investigation," its ability to combat racial discrimination in voting was "rendered relatively ineffective." *Id.* Congress thus enacted Title III to assist DOJ "during any investigation it may conduct on complaints of a denial to vote because of race." *Id.* (explaining Title III is "an essential step in the process of enforcing and protecting the right to vote regardless of color, race, religion, or national origin" (quoting *In re Wallace*, 170 F. Supp. 63, 67 (M.D. Ala. 1959))).

Title III has three relevant parts. First, Section 301 requires election officials to retain for

twenty-two months "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Second, Section 302 makes it a crime to steal or destroy records that are covered by Section 301. *Id.* § 20702. And last, Section 303 requires election officials to make records covered by Section 301 available for inspection by the Attorney General upon receiving a "demand . . . contain[ing] a statement of the basis and the purpose" for the inspection. *Id.* § 20703.

### 2. By its plain text, Title III does not cover Michigan's internally-created statewide voter registration list.

DOJ's effort to invoke Title III fails from the start because, by its plain terms, it does not require the production of Michigan's voter registration list—or any internal records created by election officials. *See Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 253 (6th Cir. 2020) ("[T]he inquiry begins—and sometimes ends—with the plain language of the statute. If the language of the statute is clear, the court applies the statute as written." (citation modified)). Title III only permits DOJ to access records that "come into [the] possession" of election officials relating to a voter's "application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. To "come into possession" of something means to receive or acquire it from someone else. *See, e.g.*, *Receive, Black's Law Dictionary* (12th ed. 2024) (defining "receive" as "to come into possession of or get from some outside source"); *Come into possession, Cambridge Dictionary,* https://dictionary.cambridge.org/us/thesaurus/come-into-possession-of (last visited Nov. 12, 2025) (listing synonyms of "come into possession" as "obtain," "acquire," and "receive"). Title III's coverage thus extends only to records that election officials *receive* or *acquire* from voters—not those that election officials *generate* or *create* themselves. Here, DOJ seeks Michigan's "computerized statewide voter registration list" (its unredacted voter list), ECF No. 1 at PageID.16-18, ¶¶56, 61, 66—an internal database *created* by Michigan election officials.

Simply put, DOJ does not seek a record—like a voter registration application—that "c[a]me into [the] possession" of Michigan's election officials. 52 U.S.C. § 20701. It is therefore not a record "required by section 20701 . . . to be retained and preserved," *id.* § 20703, and thus not within the scope of the Attorney General's demand authority under Title III. *Id.*

The Court should reject DOJ's effort to recast Title III in a broader fashion than its text can support. The "cardinal principle" of statutory interpretation is "that courts 'must give effect, if possible, to every clause and word of a statute.'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). Accordingly, Congress's choice to draft Title III to specifically reach only records and papers that "come into [the] possession" of election officials must be accorded respect and given its plain meaning. That is particularly so since Congress had "obvious alternative" language at its disposal, *Union Pac. R.R. Co. v. United States*, 865 F.3d 1045, 1050 (8th Cir. 2017), namely papers and records "in the possession" of election officials, rather than those that "come" into possession of such officials.

Indeed, Congress frequently employs the phrase "in the possession of" when it means to do so. *See, e.g.*, 30 U.S.C. § 1732(b); 6 U.S.C. § 1502(a); 18 U.S.C. §§ 3500(a)-(b), 1968(f)(3)-(4); 7 U.S.C. § 12(e); 49 U.S.C. § 47124a(b)(1). By contrast, in the comparatively few instances where Congress has employed the phrase "come into his possession," it has done so in contexts where, as here, it was referring to materials that an individual or entity received from an outside source. *See, e.g.*, 18 U.S.C. §§ 1703(a), 1709 (prohibiting a postal employee from stealing or destroying postal material that "comes into his possession"); 50 U.S.C. § 217 (requiring a soldier to turn over captured or abandoned property that "comes into his possession"); 13 U.S.C. § 214 (prohibiting a census worker from publishing or disclosing material that "comes into his possession"). As the Sixth Circuit has held: "Omitting a phrase from one statute that Congress has

used in another statute with a similar purpose 'virtually commands the . . . inference' that the two have different meanings." *Prewett v. Weems*, 749 F.3d 454, 461 (6th Cir. 2014) (quoting *United States v. Ressam*, 553 U.S. 272, 276-77 (2008)). To interpret such phrases identically—which is what DOJ seeks—would strip the Civil Rights Act's text of its intended meaning.

Once the statute is properly construed, DOJ's claim collapses. A legion of federal courts—many relying on dictionaries published contemporaneously to the Civil Rights Act of 1960—have held that to "come into possession" of something means to receive, acquire, or obtain it from some other source. *E.g.*, *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting *Random House Dictionary of the English Language* 995 (1966))); *Huddleston v. United States*, 415 U.S. 814, 820 (1974) ("The word 'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of.'" (quoting *Webster's New International Dictionary* (3d ed., 1966, unabridged))); *Perez v. Postal Police Officers Ass'n*, 736 F.3d 736, 741 (6th Cir. 2013) (defining the verb "obtain" when "used in its transitive form" to "mean[] 'to gain or attain possession or disposal of,'" and "'[t]o come into the possession of'" (second alteration in original) (first quoting *Webster's Third New International Dictionary* 1559 (1993); and then *Oxford English Dictionary* (3d ed. 2004))); *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 130 (3d Cir. 2022) (defining "acquire" as "to come into possession or control of" (quoting *The Oxford Dictionary of English Etymology* 9 (1966))). DOJ has no plausible argument that Defendants received, obtained, or acquired—*i.e.*, that they "c[a]me into [the] possession of"— the statewide voter registration list. Instead, those officials *created* that voter list themselves.

Further, in striving to give effect to every word and phrase in a statute, a court must consider the "specific context" of the phrase being interpreted and the "broader context of the statute as a whole." *Fischer v. United States*, 603 U.S. 480, 486 (2024) (quoting *Robinson v. Shell*

*Oil Co.*, 519 U.S. 337, 341 (1997)). The specific context of "come into [the] possession" in Title III is that it covers a voter's "application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. These qualifiers are important—each describes discrete documents *submitted by a voter* and other things done *by a voter*. Those actions by voters stand in stark contrast to a *state election official's conduct of creating* a computerized statewide voter list by compiling data from many underlying documents submitted to it *by voters*.

The broader context of the Civil Rights Act of 1960 also supports excluding statewide voter registration lists from the reach of Title III in the circumstances specifically at issue here—where DOJ has never alleged that it is in fact investigating a Civil Rights Act violation, but instead has at times claimed to be enforcing NVRA or HAVA. Congress created Title III as a tool to detect violations of racial discrimination in voting—*not to ascertain compliance with the NVRA or HAVA. See supra* Argument § I.C.1. In fact, it was not until 2002—decades after Title III's enactment—when Congress enacted HAVA that states were first tasked with creating and maintaining "a single, uniform, official, centralized, interactive computerized statewide voter registration list," 52 U.S.C. § 21083(a)(1)(A), yet this is exactly what DOJ now seeks from Michigan under Title III. And even then, Congress made it clear that the list was to be maintained "at the State level." *Id.* Congress simply could not have foreseen in 1960 the modern explosion in computing technology—and all the privacy and data security problems brought with it—and so could not have crafted Title III with the intent to grant DOJ unfettered access to the vast amount of sensitive voter data now contained on states' secure computer databases, which themselves would not even come to exist until decades after Title III was enacted.

### 3.    DOJ lacks a proper basis and purpose to demand records under Title III.

Because its statutory text does not reach Michigan's statewide voter registration list as a covered record or paper, the Court need go no further to deny DOJ's assertion that Title III authorizes its demand for the statewide list. But DOJ's Title III argument fails for an additional and independent reason: the statute requires DOJ to articulate a "basis *and* the purpose" for demanding records, 52 U.S.C. § 20703 (emphasis added), and DOJ's demands fail on both counts.

*First*, DOJ has not even bothered to try to articulate any basis to believe that Michigan has denied the right to vote or otherwise violated federal law. The lack of any stated basis for investigating Michigan is further highlighted by the fact that DOJ has made what appear to be near carbon copy demands to over forty other states and has sued eight states with complaints that contain nearly identical boilerplate claims and allegations. *See supra* Background § II. "Simply put, [DOJ's demand] does not identify what conduct, it believes, constitutes an alleged violation." *CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458 (5th Cir. 2018).

Indeed, even if DOJ did attempt to make such an argument, it would fail. Just months ago, the Sixth Circuit held that Michigan's practices and procedures in maintaining its statewide voter list, particularly its efforts to remove deceased voters, complied with the NVRA and were "reasonable" under the statute. *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 627-28 (6th Cir. 2025), *petition for cert. filed*, No. 25-437 (Oct. 7, 2025). As evidenced by Secretary Benson's letters responding to DOJ's demands, Michigan's voter list maintenance practices have not changed in the six months since the Sixth Circuit's decision in *Benson*. *See generally* Exs. B-C.

*Second*, DOJ's stated purpose for issuing the demand to Michigan—to "ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA" and HAVA, Ex. A at 1—is not sufficient under Title III, which is meant to permit DOJ to review

voting records for "question[s] concerning infringement or denial of constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962); *see CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 690 (D.C. Cir. 2017) (rejecting "perfunctory" statement of purpose in issuing civil investigative demand, reasoning agencies "are also not afforded unfettered authority to cast about for potential wrongdoing" (internal quotation omitted)). That is, Title III's "purpose is to enable the Attorney General to determine whether" a suit to enforce the Civil Rights Acts is appropriate, *Lynd*, 306 F.2d at 228, not to ascertain compliance with distinct laws serving separate purposes with their own enforcement mechanisms and, in the NVRA's case, disclosure provisions.[6] Throughout its correspondence and Complaint, DOJ never cited a single instance in the 65 years of Title III's existence in which the agency issued a demand for records under Title III that did not relate to investigating the "infringement or denial of their constitutional voting rights." *Id.* Proposed Intervenors are aware of no such instance.[7]

Further, even if ascertaining Michigan's compliance with the NVRA and HAVA were a proper purpose for invoking Title III, Michigan's full unredacted voter list is entirely unnecessary for DOJ to evaluate Michigan's list maintenance efforts under the NVRA and HAVA. Both statutes grant states wide discretion: State efforts under the NVRA must only be "reasonable," 52 U.S.C. § 20507(a)(4), and HAVA explicitly commits "specific choices . . . to the discretion of the State." *Id.* § 21085. Secretary Benson has already provided DOJ with more than adequate

---

[6] Indeed, in its initial letter to Michigan, DOJ never even mentioned the Civil Rights Act of 1960. *See* Ex. A.

[7] While some of the 1960s-era cases that interpreted Title III included language indicating broad deference to the Attorney General's statement of a "basis and . . . purpose" for requesting records, *see Lynd*, 306 F.2d at 226, those cases involved circumstances where Title III was being used for its intended purpose: investigations into the potential denial of voting rights on account of race. Those prior cases are thus fundamentally different than the circumstances here, where DOJ has offered no justifiable basis to support the need for records to evaluate compliance with two *other* statutes.

information to confirm that Michigan is meeting its list maintenance obligations, and DOJ has not identified any shortcomings or deficiencies in her responses. *See supra* Background § II; *see also* Ex. C at 2-6. Seemingly rather than asking follow-up questions or engaging in any further dialogue with Secretary Benson, DOJ filed this lawsuit a mere two weeks after Secretary Benson's good-faith efforts to provide DOJ with the information it seeks. Considering all the circumstances of DOJ's demand, the only conclusion that can be drawn is that DOJ can articulate no reasonable basis to justify a fishing expedition regarding Michigan's compliance with the NVRA and HAVA. *See In re Admin. Subpoena No. 25-1431-019*, No. 1:25-MC-91324-MJJ, 2025 WL 2607784, at *5 (D. Mass. Sept. 9, 2025) (quashing subpoena when DOJ "failed to show proper purpose" under the statutory scheme, rejecting the notion that "the Government's self-proclaimed say-so" is sufficient to "preclude any form of judicial review").

### 4. Title III does not prohibit redacting sensitive voter information.

Aside from whether DOJ can validly invoke Title III to demand Michigan's unredacted voter list, Title III does not require the production of sensitive and personal voter information. To reiterate, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in" voter files, such as driver's license numbers, partial social security numbers, and dates of birth. *PILF*, 92 F.4th at 56. Similarly, nothing in the text of Title III prohibits the redaction of that information. As the Fifth Circuit has explained, Title III is intended to reach only "public records which ought ordinarily to be open to legitimate reasonable inspection," but not "confidential, private papers and effects." *Lynd*, 306 F.2d at 231. The information that DOJ seeks here is not material typically "open to legitimate reasonable inspection." *Id.* To the contrary, it seeks plainly sensitive information that is typically safeguarded from prying eyes under both federal and state law. *See, e.g.*, 5 U.S.C. § 552a; 18 U.S.C. § 2721; Mich. Comp. Laws § 168.509gg. And, since driver's license numbers and partial social security

numbers were not required to be provided on voter registration forms until HAVA was enacted in 2002, *see* 52 U.S.C. § 21083(a)(5)(A)(i), the Congress that enacted Title III in 1960 would not have intended the statute's reach to extend to the disclosure of such information. That reinforces the fact that, as with the NVRA, states are free to redact sensitive, personal information when producing documents under Title III.

## II.    DOJ has not stated any other claim for relief.

The only clear request for relief in the Complaint is DOJ's demand for Michigan's statewide voter registration list. ECF No. 1 at PageID.19, Prayer for Relief, ¶D. But the Complaint also contains other fleeting suggestions that Michigan "failed to provide sufficient responses to the Justice Department's specific inquiries regarding its list maintenance procedures." *Id.* at PageID.17, ¶60. This apparently refers to DOJ's questions to Michigan regarding the state's EAVS responses and list maintenance practices, though DOJ fails to identify any specific deficiencies. To the extent that these vaguely alleged deficiencies are meant to constitute a claim for relief under the NVRA or HAVA, they fail.

*First*, Michigan has no statutory obligation to answer DOJ's questions *at all*. Through the NVRA and HAVA, Congress charged states with making "reasonable effort[s]" to perform list maintenance, 52 U.S.C. § 20507(a)(4); *see id.* § 21083(a)(1)(A), which Michigan has done, *Benson*, 136 F.4th at 627-28, but Congress never required states to report the results of that maintenance to DOJ or answer DOJ's inquiries about their list maintenance activities.[8] Accordingly, any perceived deficiencies or incompleteness in Michigan's written responses to

---

[8] Regulations require states to provide certain information *to the EAC*, not DOJ, *see* 11 C.F.R. 9428.7, and DOJ's NVRA claim does not allege that the information that Michigan provided the EAC was insufficient or otherwise violated this regulation. In fact, DOJ neither cites the regulation, nor claims any authority to enforce it.

DOJ's questions do not alone constitute a violation of the NVRA or HAVA.

DOJ attempts to fall back on its general enforcement authority to bring actions "necessary to carry out" the NVRA and HAVA, ECF No. 1 at PageID.4, 10, ¶¶10, 33 (citing 52 U.S.C. §§ 20510(a), 21111), but those provisions simply permit DOJ to bring suits to address plausibly alleged *violations* of those statutes. *Harkless v. Brunner*, 545 F.3d 445, 450 (6th Cir. 2008) ("The NVRA authorizes judicial intervention if a state fails to comply with its terms."). Here, DOJ does not allege that Michigan has *violated* any of its obligations under the NVRA or HAVA; instead, it claims to seek information to prospectively "*ensure* that the State's list maintenance program has been properly carried out in full compliance" with those laws, Ex. A at 1 (emphasis added), as it has done with dozens of other states, *see supra* Background § II. At least two fatal problems infect DOJ's argument on this score, however. First, the Sixth Circuit has already held that Michigan's voter list maintenance practices are reasonable and comply with the NVRA. *Benson*, 136 F.4th at 627-28. Second, DOJ's argument gets things backwards—DOJ cannot sue Michigan (or any other state) as part of a fishing expedition to seek out noncompliance with federal law; rather, the Attorney General can file suit when she can plausibly allege that the substantive terms of the NVRA or HAVA have been violated. *See McCloskey*, 446 F.3d at 271; *Johnson*, 2023 WL 9510833, at *5.

*Second*, DOJ's allegations are woefully inadequate. DOJ claims that Michigan failed to provide "sufficient responses" to "specific inquiries." ECF No. 1 at PageID.17, ¶60. What specific inquiries have gone unaddressed? And how are Michigan's responses insufficient? DOJ does not say, either in its Complaint or correspondence. These vague and conclusory allegations also contradict DOJ's other allegations in the Complaint, wherein it effectively conceded that Secretary Benson answered its questions, without explaining how those responses were inadequate. *Id.* at

PageID.14, 17, ¶¶49, 60; Ex. C at 2-6 (responding in depth to DOJ's questions). The Complaint thus amounts to nothing more than "labels and conclusions" about the sufficiency of Michigan's responses. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Such "naked assertions" devoid of "further factual enhancement" are not enough to state a claim. *Id.* at 557 (cleaned up); *see also Darby v. Kagler*, No. 5:16-cv-2426, 2017 WL 2869377, at *1 (N.D. Ohio July 5, 2017) (holding dismissal is warranted at the motion-to-dismiss stage where the "plaintiff's vague, conclusory, and generalized allegations are simply insufficient to raise a right to relief on her alleged claims against the defendants above a speculative level" (citing *Terrance v. Northville Reg'l Psychiatric. Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002))).

## CONCLUSION

For the foregoing reasons, Proposed Intervenors respectfully request that the Court dismiss the Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

November 12, 2025

Respectfully submitted,

*/s/ Sarah S. Prescott*
Sarah Prescott
**SALVATORE PRESCOTT PORTER & PORTER**
105 E. Main St.
Northville, MI 48167
Telephone: 248-679-8711
prescott@spplawyers.com

Aria C. Branch
Josh Abbuhl
Branden D. Lewiston
Derek A. Zeigler
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Telephone: (202) 968-4490
abranch@elias.law
jabbuhl@elias.law

blewiston@elias.law
dzeigler@elias.law

*Counsel for Proposed Intervenors the Michigan Alliance for Retired Americans, Donald Duquette, and Keely Crimando*

**CERTIFICATE OF SERVICE**

I certify that on this 12th day of November 2025, I caused to be served a copy of the above

document on all counsel of record and parties via the ECF system.

*/s/ Sarah S. Prescott*
Sarah S. Prescott
